**Andrew M. Calamari**
**Lara S. Mehraban**
**Sheldon L. Pollock**
**John O. Enright**
**Joseph P. Ceglio**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, New York 10281**
**(212) 336-5398 (Ceglio)**
**Email:  CeglioJ@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------:

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | **16 Civ. _____ (   )** |
| | : | |
| **Plaintiff,** | : | **ECF CASE** |
| | : | |
| - against - | : | **COMPLAINT** |
| | : | |
| **DAVID R. BERGSTEIN,** | : | |
| | : | **JURY TRIAL** |
| **Defendant.** | : | **DEMANDED** |
| | : | |

---------------------------------------------------------------------:

Plaintiff Securities and Exchange Commission ("Commission") for its Complaint against Defendant David R. Bergstein ("Bergstein" or the "Defendant") alleges as follows:

### SUMMARY OF THE ALLEGATIONS

1.      This case involves two fraudulent schemes orchestrated by Bergstein in 2011 and 2012 to steal investors' monies in hedge funds advised by Weston Capital Asset Management LLC ("Weston"), then a Commission-registered investment adviser.  The first scheme involved two Weston-advised hedge funds, the Weston Capital Partners Master Fund II Ltd. ("P2 Fund") and the Wimbledon Financing Master Fund Ltd. ("WFF Fund").  The second scheme involved a third Weston-advised hedge fund, the Wimbledon Fund SPC Class TT Segregated Portfolio ("TT Fund").  The schemes were highly profitable for Bergstein, who absconded with millions of dollars in investor money that he used to support his extravagant lifestyle.

2.      The first scheme stems from a 2009 transaction between Weston and Gerova Financial Group Ltd. ("Gerova"), a former purported reinsurance company controlled by securities fraud recidivist Jason Galanis.  In that transaction, Weston transferred the WFF Fund's interests in certain valuable but illiquid hedge funds to Gerova in exchange for stock in Gerova. In early 2011, the New York Stock Exchange suspended trading in Gerova's stock after reports in the press had suggested that the company was fraudulent.  As a result, Gerova's stock essentially became worthless, and Weston was anxious to recover its losses.

3.      In or about mid-2011, Bergstein approached Weston's president, Albert Hallac ("Hallac"), and Weston's general counsel, chief compliance officer, and chief operating officer, Keith D. Wellner ("Wellner").  Bergstein told Hallac and Wellner that he had lent money to Gerova, that Gerova had never repaid him, and that he thought that he and Weston had been wronged by Galanis in their business dealings with Gerova.  Bergstein proposed a two-step transaction that would get Bergstein's Gerova debts repaid, get the illiquid hedge fund interests returned to the WFF Fund, and ostensibly allow Bergstein and Weston to make money by investing in a new venture that would purportedly invest in medical-billing businesses.

4.      In the first step of the transaction, Bergstein arranged an "unwind" of the Weston-Gerova transaction with Galanis whereby the illiquid hedge fund interests were returned to the WFF Fund and Gerova's stock was returned to Gerova.

5.      In the second step of the transaction, Bergstein required Weston to provide money for the purported purposes of paying off certain Gerova debts and investing in a new venture that would invest in medical-billing businesses.  Bergstein told Hallac and Wellner that he was creating a new special purpose vehicle called Arius Libra Inc. ("Arius Libra") to invest in medical-billing businesses.  Bergstein proposed that Hallac and Wellner first contribute and pledge the WFF Fund's illiquid hedge fund interests to Arius Libra in exchange for an equity stake in that entity, and next use the P2 Fund's assets to make a loan to Arius Libra that would be used to (i) pay off approximately $3 million worth of Gerova's debts, including purported debts to Bergstein, and (ii) to invest in medical-billing businesses.  Bergstein proposed that Arius Libra

2

use the illiquid hedge fund interests pledged by WFF to serve as collateral for the loan from the P2 Fund.

6.     Hallac and Wellner agreed to Bergstein's proposal.  On or about August 3, 2011, Hallac and Wellner caused the WFF Fund to pledge its recently-returned illiquid hedge fund interests to Arius Libra in exchange for an equity interest in Arius Libra, despite the fact that the WFF Fund's investment mandate, as set out in its offering documents, did not permit that kind of investment.  On or about August 3, 2011, Bergstein caused Arius Libra to issue a note to the P2 Fund with a principal amount of $3.6 million that was later increased to $9 million.  From on or about August 4, 2011 through on or about November 18, 2011, Hallac and Wellner caused the P2 Fund to lend more than $8.6 million to Arius Libra for the purported purposes of paying off Gerova's debts and investing in medical-billing businesses.  Hallac and Wellner caused the P2 Fund to enter into the note with Arius Libra and lend it $8.6 million thereunder, despite the fact that the P2 Fund's investment mandate, as set out in its offering documents, did not permit that kind of investment.  And Hallac and Wellner agreed to allow Arius Libra to use the illiquid hedge fund assets to serve as collateral for the loan from the P2 Fund, an arrangement that raised a significant conflict of interest for Weston because it had transferred one hedge fund's (the WFF Fund's) assets to a third party (Arius Libra) to collateralize a loan Arius Libra was receiving from another one of its hedge funds (the P2 Fund).

7.     Bergstein then defrauded the P2 Fund by stealing at least $2.3 million of the money Arius Libra borrowed under the P2 Note for the purported purpose of investing in medical-billing businesses to pay for his and an associate's personal and unrelated business expenses.  Bergstein also aided and abetted Weston's fraud on both the WFF Fund investors and the P2 Fund investors by helping Hallac and Wellner lie to them about these transactions and the conflicts of interest they raised for Weston, and then try to cover them up.

8.     Hallac and Wellner did not contemporaneously disclose to WFF Fund or P2 Fund investors any of the following three material facts concerning the transactions:  (1) that they had pledged the WFF Fund's illiquid hedge fund assets to Arius Libra in exchange for an equity

interest in Arius Libra; (2) that the P2 Fund had lent more than $8.6 million under the P2 Note to Arius Libra; or (3) that Arius Libra was using the illiquid hedge fund assets to collateralize the loan to the P2 Fund.  On or about December 11, 2011, Bergstein, Hallac, and Wellner met with certain WFF Fund investors and at least one P2 Fund investor and only then disclosed to them the first fact:  that the WFF Fund's illiquid hedge fund assets had been pledged to Arius Libra in exchange for an equity interest in Arius Libra.  As for the P2 Note and Arius Libra's use of the illiquid hedge fund assets to serve as collateral under the note, Bergstein, Hallac, and Wellner intentionally hid these facts from the investors, saying only that Arius Libra had borrowed $8 million but not saying from whom—*i.e.*, the P2 Fund.

9.     After that meeting until in or about May 2012, WFF Fund and P2 Fund investors continued to ask Hallac and Wellner for additional details about these transactions and, most important, the identity of the lender to Arius Libra.  In response, Bergstein drafted, and Wellner signed, a sham note that purported to make the lender to Arius Libra, not the P2 Fund, but rather another Bergstein-controlled nominee, Swartz IP Services Group Inc. ("Swartz IP").  Wellner then lied to investors, telling them that the counterparty to the P2 Note was Swartz IP.  Bergstein and Wellner lied to another investor at an in-person meeting in Los Angeles in or about May 2012, where Bergstein told the investor that the P2 Note's counterparty was Swartz IP.  This lie was material to Weston's investors because it concealed a substantial conflict of interest by Weston, and a significant credit risk exposure to Arius Libra and Bergstein.

10.    In the second scheme, Bergstein used Swartz IP to steal money from investors invested in another Weston-advised hedge fund, the TT Fund.  Similar to the P2 Note scheme, Bergstein convinced Weston to invest money into Swartz IP pursuant to a note issued by Swartz IP.  The TT Fund's investment objective was limited to investing—either directly or through an over-the-counter option—in one specific third-party hedge fund.  Bergstein induced Hallac and Wellner to enter into the note by sending them a fraudulent balance sheet that falsely stated Swartz IP had more than $16 million in assets when in fact it had none.  Bergstein also induced Hallac and Wellner to enter into the note by telling them that the money borrowed under the note

4

would be used to invest in medical-billing businesses, when Bergstein knew that he intended to misappropriate money under the note to pay for his own personal and unrelated business expenses.

11.     On or about November 14, 2011, Bergstein arranged for Swartz IP to issue a $25 million note to the TT Fund (the "TT Note").  Swartz IP issued the TT Note for, among other reasons, the purported purpose of raising capital to invest in medical-billing businesses.

12.     Between in or about November 14, 2011 and December 8, 2011, Bergstein arranged for Weston to wire more than $17.7 million from the TT Fund to Swartz IP.  Bergstein in turn wired those investor monies to various third parties, including entities he controlled for his personal benefit.  In sum, Bergstein misappropriated more than $3.5 million received under the TT Note to fund his personal expenses.

## VIOLATIONS

13.     By virtue of the conduct alleged herein, the Defendant, directly or indirectly, violated and is otherwise liable for violations of the federal securities laws as follows:  Section 10(b) of the Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and Section 209(f) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-9(f)] by aiding and abetting Weston's violations of Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2), and (4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-(8)].

## JURISDICTION AND VENUE

14.     The Commission brings this action pursuant to the authority conferred upon it by Sections 21(d)(1) and 21(d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and 78u(d)(5)] and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)], seeking a final judgment:  (a) restraining and permanently enjoining the Defendant from engaging in the acts, practices, and courses of business alleged against him herein; (b) ordering the Defendant to disgorge all ill-gotten gains and to pay prejudgment interest on that amount; and (c) imposing civil money

penalties on the Defendant pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

15.     This Court has jurisdiction over this action, and venue lies in this District, pursuant to Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa] and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].  The Defendant, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the transactions, acts, practices, or courses of business alleged herein, certain of which occurred in this District.  For example, during the relevant period, Weston maintained an office at 767 Third Avenue, 25th Floor, New York, New York 10007.  Bergstein sent emails and placed phone calls to Weston employees in that office, and Weston employees in that office, including Wellner, sent and received emails to and from investors, uploaded important investor documents to an internet library made accessible to investors, met in person with investors, and conducted transactions with Bergstein, Arius Libra, and Swartz IP.

## DEFENDANT

16.     **Bergstein**, age 54, resides in Hidden Hills, California.  Bergstein has never been registered with the Commission and he holds no securities licenses.  Bergstein has produced movies and holds himself out as the chief executive officer of a private equity company that performs a range of services, including private and public debt structuring.  Bergstein is also the president and secretary of Swartz IP.

## OTHER RELEVANT ENTITIES AND INDIVIDUALS

17.     **P2 Fund** was a Weston-advised, Cayman Islands-exempted company with multiple classes of shares.  The P2 Fund was a fund of funds with a stated investment objective, according to its offering documents, "to achieve substantial capital appreciation by investing in 'start-up' investment pools or 'hedge funds' in a variety of trading sectors run by talented Managers [that] have not yet raised large pools of capital to manage, but whose principals have

significant investment experience."  During the relevant period, the P2 Fund invested in hedge funds managed by two separate investment advisers.

18.  **TT Fund** was a Weston-advised, Cayman Islands-exempted company with multiple classes of shares.  The TT Fund was a fund of funds that invested all of its assets, either directly or notionally, in a third-party hedge fund.  The TT Fund's offering documents stated the following about how fund assets would be invested:  "All of the assets attributable to the Class TT Shares (the 'Class TT Assets') are invested, either directly or notionally (through the acquisition of a leveraged, structured, over-the-counter option), in [the third-party hedge fund]."

19.  **WFF Fund** was a Weston-advised, Cayman Islands-exempted company.  The WFF Fund was a fund of funds with a stated investment objective, according to its offering documents, of "investing in investment pools ('Investment Pools') managed by investment managers ('Managers'). . . .   Managers may invest through Investment Pools in secured and unsecured loans (including term loans, revolving credit facilities, bridge loans, high-yield loans, bullet payment loans, collateralized first lien loans, subordinated loans, mezzanine debt and any other type of debt financing acceptable to the Managers) and convertible and non-convertible notes and other debt instruments."

20.  **Arius Libra** is a Delaware corporation incorporated by Bergstein on or about July 28, 2011.  During the relevant time period, Arius Libra had no office, no employees, and no operations.  Arius Libra's secretary is a Bergstein associate ("Associate 1").  Bergstein controlled Arius Libra.

21.  **Purple Box LLC ("Purple Box")** was a limited liability company organized by Hallac, Wellner, and a third Weston executive ("Weston Executive 1") under Delaware law on or about August 2, 2011.  Hallac and Wellner controlled Purple Box.  On or about May 11, 2012, Hallac opened a bank account in Purple Box's name.

22.  **Swartz IP** is a Texas corporation incorporated by Bergstein on or about December 2, 2010.  Bergstein controls Swartz IP.  Bergstein is the signatory on bank and brokerage accounts he opened in Swartz IP's name.

23.     **Weston** was a Delaware limited liability company formed in or around 2000 with an office in New York, New York.  Weston registered with the Commission as an investment adviser effective September 2001, and was registered with the Commission during the relevant period.  Weston provided discretionary investment management and sub-advisory services to domestic and foreign private investment funds, as well as domestic and foreign institutions and high net worth individuals.  On June 23, 2014, the Commission filed a civil injunctive action against Weston for its role in the TT Fund scheme described herein.  *Securities and Exchange Commission v. Weston Capital Asset Management LLC, et al.*, 14-CV-80823 (COHN) (S.D. Fla.) ("*SEC v. Weston*").  Weston was charged with primary violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder, and Sections 206(1), 206(2), 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.  On July 7, 2014, the court entered a judgment against Weston on its consent permanently enjoining it from further violating the respective securities laws it had violated.  On June 22, 2015, Weston consented to a final judgment against it, which ordered Weston to pay $406,254 in disgorgement plus pre-judgment interest and a civil penalty of $406,254.

24.     **Galanis**, age 45, controlled Gerova, the entity that entered into a transaction with the WFF Fund in 2009.  He is currently incarcerated at the Metropolitan Detention Center pending his sentencing in *United States v. Galanis*, 15 Cr. 643 (S.D.N.Y.).  In September 2015, Galanis was charged by the U.S. Attorney's Office for the Southern District of New York ("USAO"), and sued by the Commission in *SEC v. Galanis*, 15 Civ. 7547 (S.D.N.Y.), for orchestrating a fraudulent and unregistered public distribution of millions of dollars of shares of Gerova stock.  On July 21, 2016, Galanis pleaded guilty in the criminal action to two counts of conspiracy to commit securities fraud, one count of securities fraud, and one count of investment adviser fraud.  On May 11, 2016, the Commission and the USAO separately charged Galanis for orchestrating another alleged securities fraud scheme involving defrauding investors in sham Native American tribal bonds.  *See United States v. Galanis*, 16 Cr. 371 (S.D.N.Y.); *SEC v. Archer*, 16 Civ. 3505 (S.D.N.Y.).  On November 2, 2016, the USAO filed a superseding

indictment against Galanis and his co-defendants.  Prior to those actions, Galanis was the subject of a 2005 Commission action, *SEC v. Penthouse Int'l, Inc.*, 05 Civ. 0780 (S.D.N.Y.), for engaging in accounting fraud and financial-reporting violations.  On April 26, 2007, Galanis consented to a judgment in that case in which, among other things, he agreed to be enjoined from violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and to an officer-and-director bar.  Galanis thereafter served as an undisclosed control person of Gerova while that bar was effective.

25.   **Hallac**, age 79, resides in West Palm Beach, Florida.  Hallac was Weston's founder and president, and at all relevant times, controlled Weston.  He previously held Series 00 (predecessor to Series 24) and F04 (Financial Principal) licenses.  On June 23, 2014, the Commission filed a civil injunctive action against Hallac for his role in the TT Fund scheme. *See SEC v. Weston*.  Hallac was charged with primary violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder, and Sections 206(1), 206(2), 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.  *See SEC v. Weston*.  Hallac subsequently settled those claims.  On July 7, 2014, the court entered a judgment against Hallac on his consent permanently enjoining him from future violations of the respective securities laws he had violated.  That same day, the Commission issued a settled order instituting administrative proceedings against Hallac pursuant to Section 15(b) of the Exchange Act and Section 203(f) of the Advisers Act under which he accepted a full associational bar and a penny stock bar.  *In the Matter of Albert Hallac*, Adm. Proc. File No. 3-15971 (July 15, 2014).  On June 22, 2015, Hallac consented to a final judgment in which he was ordered to pay $268,461 in disgorgement plus pre-judgment interest and a civil penalty of $268,461.  On July 7, 2015, the USAO criminally charged Hallac pursuant to an Information with one count of conspiracy to commit investment adviser fraud and securities fraud in violation of 18 U.S.C. § 371; one count of investment adviser fraud in violation of 15 U.S.C. §§ 80b-6 and 80b-17, and 18 U.S.C. § 2; one count of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 20.10b-5, and 18 U.S.C. § 2; one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349; and one

count of wire fraud in violation of 18 U.S.C. §§ 2 and 1343. *United States v. Hallac*, 15 Cr. 512 (RMB) (S.D.N.Y.). Hallac pleaded guilty on January 14, 2016.

26. **Wellner**, age 49, resides in New York, New York. Wellner was Weston's general counsel, chief compliance officer, and chief operating officer during the relevant period. Wellner stopped working at Weston in or around October 2012. Wellner held Series 7, 24, and 63 licenses and was employed in a registered capacity by Weston and its affiliates in 2011 and 2012. On June 23, 2014, the Commission filed a civil injunctive action against Wellner for his role in the TT Fund scheme. Wellner was charged with aiding and abetting Weston and Hallac's violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder, and Sections 206(1), 206(2), 206(4) of the Advisers Act and Rule 206(4)-8 thereunder. *See SEC v. Weston*. Wellner subsequently settled those claims. On July 7, 2014, the court entered a judgment against Wellner on his consent permanently enjoining him from further violating the respective securities laws he had violated. Wellner's judgment also ordered him to disgorge $120,000 in ill-gotten gains plus prejudgment interest. On August 1, 2014, the Commission issued a settled order instituting administrative proceedings pursuant to Section 203(f) of the Advisers Act against Wellner under which he was barred from working in the securities industry. *In the Matter of Keith D. Wellner*, Adm. Proc. File No. 3-15998 (Aug. 1, 2014). The same day, the Commission issued a settled order instituting administrative proceedings pursuant to Rule 102(e) of the Commission's Rules of Practice under which Wellner was suspended from appearing or practicing as an attorney before the Commission.

## FACTS

### A.    The P2 Fund Scheme

#### 1.    Background

27.    Bergstein's P2 Fund scheme had two steps: (1) Arius Libra issued the P2 Note to the P2 Fund, and Bergstein misappropriated the loan's proceeds; and (2) Bergstein, Hallac, and Wellner misrepresented to WFF Fund and P2 Fund investors the true identity of the parties to the P2 Note, and created a false and misleading P2 Note in furtherance of that fraud.

10

28.     The P2 Fund scheme originated from an unsuccessful 2009 transaction between the WFF Fund and Gerova, a New York Stock Exchange ("NYSE")-listed issuer controlled by Galanis, a securities fraud recidivist.

29.     In the WFF Fund-Gerova transaction, Weston transferred substantially all of the WFF Fund's assets—interests in approximately 15 illiquid hedge funds (their illiquidity the result of the 2008 financial crisis)—to Gerova in exchange for Gerova stock.  Hallac, acting on behalf of Weston, agreed to the transaction because he wanted to recover any value he could out of the illiquid hedge fund assets, which had been diminished by the financial crisis.

30.     On or about February 23, 2011, however, NYSE suspended trading in Gerova's stock, causing its equity shares to become essentially worthless soon thereafter.  WFF Fund investors complained to Weston about this ill-advised transaction because Weston had exchanged their valuable hedge fund-assets for essentially worthless, unregistered shares in Gerova.

31.     In or about mid-2011, Bergstein approached Hallac and Wellner with a series of transactions that induced Weston to lend one of its hedge funds' money to an entity Bergstein controlled, Arius Libra, for a purported investment in medical-billing businesses.  Bergstein used the disastrous Gerova-WFF transaction as his opportunity to approach Hallac and convince him to agree to the loan.  Bergstein told Hallac and Wellner that he knew Galanis, that he had lent a lot of money to Gerova, and that Gerova had a number of outstanding debts, including money it owed Bergstein.  Bergstein told Hallac and Wellner that he could convince Galanis to unwind the transaction, whereby Gerova got its stock back and the WFF Fund got its hedge fund assets back, but that someone would need to pay Gerova's outstanding debts, including Gerova's debts to Bergstein himself.  Bergstein proposed that the WFF Fund pledge its valuable but illiquid hedge fund assets to Arius Libra in exchange for an equity interest in Arius Libra.  Bergstein also proposed to Hallac and Wellner that another Weston-advised hedge fund make a short-term loan to Arius Libra that would be used in part to repay Gerova's debts and in part to invest in the medical-billing business.  Bergstein misrepresented that he was in the process of obtaining a loan

11

from a large financial services firm for the same purposes, but that the loan had not yet closed.  Bergstein stated that once the loan became final, then the Weston fund would be paid back in full.  Hallac and Wellner agreed and chose the P2 Fund as the lender to Arius Libra.

>    **2.      Arius Libra Issues the P2 Note to the P2 Fund and Bergstein Misappropriates the Loan Proceeds**

32.      Bergstein assisted Weston and Gerova in entering into an unwind agreement under which the illiquid hedge fund interests were returned to the WFF fund, the Gerova stock was returned to Gerova, and certain purported Gerova debts, some of which Bergstein claimed he owned, would be repaid.

33.      As part of his scheme, Bergstein proposed to create a special purpose vehicle to issue a note to the P2 Fund in exchange for money to pay off Gerova's debts and to invest in medical-billing businesses.

34.      As part of this plan, the WFF Fund would pledge its illiquid hedge fund assets to this special purpose vehicle in exchange for an equity ownership stake in the entity, which would then use the assets to collateralize the loan from the P2 Fund.

35.      To that end, Bergstein formed Arius Libra on or about July 28, 2011 under Delaware law to serve as the special purpose vehicle.  Bergstein installed Associate 1 to act as Arius Libra's secretary.  Associate 1 had never worked in the medical-billing business and had no training or expertise in the medical-billing business.

36.      On or about June 30, 2011, Weston sold the P2 Fund's entire position of approximately $12 million in one of the two third-party hedge funds in which it invested.  That position constituted approximately 21% of the P2 Fund's total assets of approximately $58 million.  On or about July 12, 2011, Weston caused the cash proceeds of that sale to be deposited into the P2 Fund's bank account.

37.      Before liquidating the third-party hedge fund position, the P2 Fund's cash position was approximately $1.1 million.  As a result of the sale, the P2 Fund's cash position

grew to approximately $13.1 million.  But for the sale of the third-party hedge fund position, the P2 Fund would have not had sufficient cash on hand to fund the P2 Note.

38.     On or about August 3, 2011, the WFF Fund and Arius Libra entered into contribution and pledge agreements ("WFF Contribution and Pledge Agreements") under which the WFF Fund agreed to pledge and contribute its interests in the illiquid hedge fund assets, which constituted substantially all of its assets, to Arius Libra in exchange for an equity interest in Arius Libra.  Hallac signed these contracts on behalf of the WFF Fund and Associate 1 signed on behalf of Arius Libra.

39.     On or about August 3, 2011, Arius Libra issued the P2 Note, which Bergstein had drafted, to the P2 Fund.  The P2 Note had a principal face amount of $3.6 million, a coupon of 5%, and a stated maturity of December 31, 2011.  Arius Libra and the P2 Fund subsequently amended the P2 Note to increase the principal's face amount to $9 million.  Associate 1 signed the P2 Note on Arius Libra's behalf on or about August 3, 2011 and returned it to Hallac and Wellner.

40.     The first page of the P2 Note included a legend stating that the note had not been registered under the Securities Act or any state securities laws and that it should not be sold, assigned, or transferred except pursuant to an effective registration statement filed with the Commission or pursuant to an exemption to the Commission's registration requirements.

41.     Bergstein told Hallac and Wellner in an August 25, 2011 email that, with respect to the P2 Note's funding, "I am arranging it to maximize what your investors will be receiving while addressing all the other objectives."

42.     On or about August 25, 2011, Bergstein told Hallac and Wellner that he would be able to quickly repay the principal under the P2 Note on Arius Libra's behalf because he claimed that he had arranged financing in the form of a loan of approximately $8 million from a specific, large financial services firm.  Bergstein knew, should have known, or was reckless in not knowing, that that claim was false because he had not in fact arranged for an approximately $8 million loan from the specific, large financial service firm.

13

43.     The P2 Fund's investment in the P2 Note contravened the P2 Fund's investment mandate as set out in its offering documents.  To wit, the P2 Fund's offering documents' stated investment objective was to invest in "start up" "hedge funds" run by "talented [m]anagers." The P2 Fund's loan to Arius Libra under the P2 Note contravened the P2 Fund's stated investment objective because Arius Libra was not a "start up" "hedge fund" and neither Bergstein nor Associate 1 was a hedge fund manager.

44.     From on or about August 4, 2011 through November 18, 2011, and again from in or about April 2012 through May 2012, Bergstein caused Arius Libra to draw down money under the P2 Note pursuant to a series of "borrowing certificates."  The borrowing certificates included the amount of money to be borrowed, the payee, and wiring instructions.  Bergstein caused Associate 1 to sign the borrowing certificates on Arius Libra's behalf, and then emailed them to Wellner and Hallac.[1]  Bergstein often included a cover email with each borrowing certificate that explained the purported purpose of the wire and the purported use of the proceeds. Bergstein knew, should have known, or was reckless in not knowing, that he was misrepresenting to Wellner and Hallac the true purpose of many of those wires and the use of their proceeds.

45.     The P2 Fund lent Arius Libra more than $8.6 million under the P2 Note.

46.     Arius Libra did not repay any of the $8.6 million lent to it by the P2 Fund under the P2 Note.

47.     Despite Bergstein's representations to Weston that the purpose of the P2 Note was to invest in medical-billing businesses to generate superior returns to P2 Fund investors, Bergstein misappropriated at least $2.3 million in investor monies he claimed would be invested in medical-billing businesses to pay for his personal expenses and maintain his elaborate lifestyle.  Four examples are detailed below:

---

[1]     At least some of these borrowing certificates were emailed from outside of New York state and received by Wellner in Weston's New York, New York office.

### a.      August 29, 2011 Misappropriation

48.      On or about August 29, 2011, Bergstein sent Wellner, Hallac, and Weston Executive 1 a borrowing certificate with a cover email stating, "I need the following if possible. . . . $150,000 to [a Bergstein-controlled entity's bank account].  I need the $150K to handle what is going on with Bidz/Matrix."

49.      On or about August 30, 2011, Wellner and Hallac arranged for $150,000 to be wired to the Bergstein-controlled entity's bank account.  Prior to receiving this $150,000, the account had a negative balance of ($147.13).  Although "Matrix" was an entity created by Bergstein and Associate 1 for the purported purpose of investing in medical-billing businesses, "Bidz" was an entity unrelated to medical billing.  In any event, Bergstein did not use the money to invest in "Bidz," "Matrix," or any other medical-billing business as he had represented.  Rather, Bergstein used the money substantially to pay for his and Associate 1's personal and unrelated business expenses.

### b.      October 24, 2011 Misappropriation

50.      On or about October 24, 2011, Bergstein emailed a borrowing certificate to Hallac, Wellner, and Weston Executive 1.  The cover email to the borrowing certificate stated, "Attached is the borrowing cert for the purchase of the bidz stock – which is part of the Pineboard transaction" (a transaction purportedly related to medical billing).  The attached borrowing certificate called for $150,000 to be wired to a bank account in the name of a Bergstein-controlled entity.

51.      On or about October 25, 2011, Hallac caused Weston to wire $150,000 to a bank account in the name of an associate of Bergstein and Associate 1.  At the time, the account had $14.16 in funds.  Instead of using the money to purchase "bidz stock," or to otherwise invest in medical-billing businesses as he represented, Bergstein used the money substantially to pay for his and Associate 1's personal and unrelated business expenses.

### c.   October 31, 2011 Misappropriation

52.    On or about October 31, 2011, Bergstein emailed a borrowing certificate to Hallac and Wellner that called for, among other wires, a $400,000 wire to a client trust account of a lawyer who represented Bergstein.  In his cover email, Bergstein stated, "Ideally, another $400k would go to [Bergstein's lawyer]. . . .  $300K I have slated for Cascade" (a purported medical-imaging device company).

53.    On or about that day, October 31, 2011, Wellner caused $400,000 to be wired from the P2 Fund's bank account to Bergstein's lawyer's trust account.  Instead of using the money for "Cascade," or to otherwise invest in medical-billing businesses as he represented, Bergstein used the money substantially to pay for his and Associate 1's personal and unrelated business expenses.

### d.   The November 10, 2011 Misappropriation

54.    On or about November 10, 2011, Bergstein emailed a borrowing certificate dated November 8, 2011 to Hallac and Wellner with a cover email directing a $350,000 wire to the client trust account of a lawyer who represented Bergstein.  On or about that day, Hallac caused $350,000 to be wired out of a P2 Fund bank account to Bergstein's lawyer's client trust account. Instead of using the money to invest in medical-billing businesses, Bergstein used the money substantially to pay for his and Associate 1's personal and unrelated business expenses, including expenses incurred with a home entertainment contractor, a Las Vegas nightclub, and an antiques shop.

55.    Thereafter, Commission staff took Bergstein's sworn testimony in connection with an enforcement investigation it was conducting.  When the staff asked Bergstein about the purpose of the November 10, 2011 wire of $350,000 to his attorney's client trust account, Bergstein testified, under oath, that it was for investment in a medical-billing business. Bergstein knew, should have known, or was reckless in not knowing, that his sworn testimony regarding the purpose of the $350,000 wire to his attorney's client trust account was false.

### 3. Bergstein and Weston Misrepresented to WFF Fund and P2 Fund Investors That the Counterparty to the Note Was the P2 Fund

56.     Weston's principals, including Hallac and Wellner, did not disclose the fact of the P2 Note or the WFF Pledge and Contribution Agreements to either the P2 Fund or WFF investors until in or around December 2011.  When Bergstein, Hallac, and Wellner did tell those investors about the P2 Note and the WFF Pledge and Contribution Agreements, they materially omitted the fact that the lender under the P2 Note was the P2 Fund.

57.     The WFF Fund's largest investors questioned Hallac and Wellner about the P2 Note in or around late 2011 through May 2012.  The initial questioning led to an in-person meeting in a West Palm Beach, Florida hotel on or about December 11, 2011 attended by, on the one hand, multiple WFF Fund investors, one of whom was also a P2 Fund investor, and on the other hand, Hallac, Wellner, Bergstein, and a Bergstein associate, who purported to represent at least one of the medical-billing businesses in which Arius Libra was investing.

58.     Weston's presentation materials at that meeting, which were prepared by Bergstein, misleadingly stated that Arius Libra had "arranged for a loan against the hedge fund assets to provide the cash necessary to perform the obligations required pursuant to the Unwind agreement [with Gerova]" without disclosing the true lender of the borrowed funds—the P2 Fund, another Weston-advised hedge fund in which at least one or more of the WFF Fund investors had invested.

59.     This information was material to the WFF Fund and P2 Fund investors because they would have wanted to know that the business they now had an ownership interest in, Arius Libra, had borrowed money not from a third-party lender, but from another Weston-advised hedge fund, the P2 Fund.  They would have also wanted to know that this created a significant conflict of interest for Weston because two hedge funds it advised—the WFF Fund and P2 Fund—were on both sides of this transaction.  The investor in both the WFF Fund and the P2 Fund would have also wanted to know that if Arius Libra defaulted on the P2 Note, substantially

all of the WFF Fund's assets, which collateralized the P2 Note, would be liquidated to pay back the money lent by the P2 Fund.

60.     Following the December 11, 2011 investor meeting, the WFF Fund investors repeatedly sought from Hallac and Wellner—both orally and in writing—additional information about the P2 Note and the WFF Contribution and Pledge Agreements, most pertinently, the identity of the counterparty to the P2 Note.

61.     In response to these repeated requests from the WFF Fund investors, Bergstein suggested to Wellner that Weston misleadingly tell investors that the P2 Note counterparty was Swartz IP, a Bergstein-controlled entity, as opposed to the P2 Fund, to conceal that the lender was another Weston-advised fund.  Bergstein suggested they create a sham note identifying Swartz IP, instead of the P2 Fund, as the purported lender.  Bergstein did this because he knew Weston did not want investors to know about the existence of the true identity of the lender under the P2 Note for the reasons described in paragraph 59.

62.     On or about December 21, 2011, Bergstein sent Wellner an email with a list of items to address, including "Swart[z] should be lender to Arius."

63.     In or around April 2012, Bergstein drafted a sham replacement P2 Note between Arius Libra and Swartz IP (the "Sham P2 Note") that was identical to the P2 Note in all respects except that the lender was falsely identified as Swartz IP instead of the P2 Fund.

64.     In or around April 2012, Wellner traveled to Los Angeles, California to meet with Bergstein, at which time Bergstein gave him the Sham P2 Note.  Wellner, who had become a director of Arius Libra as a result of the equity stake the WFF Fund had received in Arius Libra, later signed the Sham P2 Note on Arius Libra's behalf.

65.     The Sham P2 Note was fraudulent because it did not accurately reflect the transaction and was intentionally designed to hide from investors the identity of the real lender to Arius Libra—the P2 Fund.

66.     Upon returning to New York from his meeting with Bergstein, Wellner met with anxious WFF Fund investors and orally told them that the counterparty to the P2 Note was Swartz IP and referred to Swartz IP as the counterparty to the P2 Note in an email.

67.     On or about March 15, 2012, certain WFF Fund and P2 Fund investors sent Wellner a due-diligence request list concerning the specifics of the P2 Note and the purported investment in medical billing.  Wellner drafted a responsive document and uploaded it to an internet-based library he had created and to which he periodically placed important information for investors to access and review.

68.     One of the questions on the list asked Weston to identify all debts held by Arius Libra.  In or about April 2012, Wellner caused his assistant to draft and upload to the online library a .pdf document with the filename "Arius Libra debt" that stated the following:  "Arius Libra currently has indebtedness in favor of Swartz IP Services Group, Inc.  The face value of the debt is $8 million and it is secured by a first priority lien of the hedge fund assets of Arius Libra."

69.     A number of WFF Fund investors downloaded this document, which materially misrepresented that Swartz IP, not the P2 Fund, was the counterparty to the P2 Note.  The omitted identity of the Arius Libra lender was material to investors because if they had known the truth—that the P2 Fund, a sister fund of the WFF Fund, was the real lender—they would have had serious concerns about the overall risk exposure of their WFF Fund's investment in Arius Libra, especially in light of the size of the P2 Fund and WFF Fund's combined investment in this newly-formed entity controlled by Bergstein.

70.     In or around May 2012, Bergstein, Hallac, and Wellner met with WFF Fund investors in Los Angeles.  Bergstein, in the presence of Hallac and Wellner, misrepresented to them that Swartz IP was the true counterparty to the P2 Note.  Bergstein knew, should have known, or was reckless in not knowing, that he was misrepresenting a material fact to the WFF Fund investor.

**B.     The TT Fund Scheme**

**1.     Background**

71.     In or about November 2011, Bergstein proposed to Hallac and Wellner a second transaction in which Bergstein would use Swartz IP to issue notes to another Weston-advised fund.  Swartz IP would issue notes to borrow money to purportedly invest in medical-billing businesses through another special purpose vehicle Bergstein had recently created and controlled, Pineboard Holdings, Inc. ("Pineboard").

72.     To induce Hallac to lend money to Swartz IP, Bergstein told Hallac that Swartz IP was an entity he and a wealthy Long Island entrepreneur had created.  As Bergstein knew, should have known, or was reckless in not knowing, the wealthy Long Island entrepreneur had little to no involvement with Swartz IP.

73.     On or about November 15, 2011, to evidence Swartz IP's creditworthiness and thus further induce Hallac to lend money to Swartz IP, Bergstein emailed Hallac and Wellner a purported Swartz IP balance sheet that reflected total assets as of September 30, 2011 of $16,956,746, including $16,234,002 in cash and securities.

74.     Bergstein knew, should have known, or was reckless in not knowing, that the balance sheet was false, as Swartz IP was nothing but a shell entity with little to no assets.  Indeed, Bergstein did not even open a bank account in Swartz IP's name until on or about December 5, 2011 and had only opened a brokerage account in Swartz IP's name a few days earlier, on or about November 11, 2011.  As of November 15, 2011, the brokerage account had a zero balance.

75.     Hallac and Wellner, unaware that the Swartz IP balance sheet was fraudulent, agreed to have a Weston-advised fund, the TT Fund, enter into the transaction.  The TT Fund's investment objective, as set out in the fund's offering documents, however, was to invest solely—either directly or notionally—in a particular third-party hedge fund (the "Hedge Fund").  If the TT Fund invested in the Hedge Fund notionally, the offering documents stated that it

would do so only "through the acquisition of a leveraged, structured, over-the-counter option" in the Hedge Fund.

### 2.    The Note Purchase Agreement, the TT Note, and the Side Letter

76.    On or about November 14, 2011, Bergstein emailed Hallac and Wellner a Note Purchase Agreement ("NPA") of the same date between Swartz IP and the TT Fund.[2]  The NPA was ultimately signed on Swartz IP's behalf by Associate 1 and on the TT Fund's behalf by its fund administrator.

77.    The NPA stated that Swartz IP would issue up to $25 million in reference notes to the TT Fund due November 14, 2014.  The NPA did not state that Swartz IP would make periodic interest payments to the TT Fund under the notes.  Instead, the NPA contained a "principal reset" provision, drafted by Bergstein, which stated that each note's principal would be tied to the monthly returns of the Hedge Fund.  If the Hedge Fund's net asset value increased in a given month, the note's principal would increase accordingly; if the Hedge Fund's net asset value decreased in a given month, the note's principal would decrease accordingly.  In addition to those monthly changes, the note's principal was to be increased annually by 1%.

78.    Bergstein's drafting of these provisions reflected his understanding of the TT Fund's investment mandate to invest solely in the Hedge Fund.  The TT Note's promise of a return 1% greater than the Hedge Fund's return was intended to induce Weston to cause the TT Fund to enter into the note.

79.    The NPA also stated that, concurrent with the issuance of the notes, Swartz IP would deliver to the TT Fund warrants to purchase up to 3% of the stock of Pineboard, the special purpose vehicle Bergstein had recently created for the purported purpose of investing in medical-billing businesses.

---

[2]    Wellner received Bergstein's email and its attachments in Weston's New York, New York office.

80.     The notes, the Pineboard warrants, and any Pineboard stock to be issued upon exercise of the warrants were collectively defined in the NPA as the "Securities" being acquired by the TT Fund.  The NPA further stated that the "Securities" had not been registered under the Securities Act, and that the TT Fund affirmed it was an "'accredited investor' as that term is defined by Rule 501 of the Securities Act."

81.     In addition to its obligations to pay the TT Fund back the note's principal, as adjusted by the "principal reset" provision, and deliver the warrants to the TT Fund, Swartz IP was obligated to honor up to 50% of any TT Fund investor's request to redeem its position in the TT Fund.

82.     In sum, under the NPA, Swartz IP promised to pay back to the TT Fund the returns it would have earned by continuing to invest in the Hedge Fund, plus 1%; transfer warrants to purchase up to 3% of Pineboard's stock; and honor 50% of any TT Fund investor's redemption request.

83.     On or about November 14, 2011, Bergstein, on behalf of Swartz IP, drafted and sent a note to the TT Fund in a principal amount of $25 million ("TT Note") under the NPA. The TT Note's maturity date was November 14, 2014.  Associate 1 signed the TT Note on Swartz IP's behalf.

84.     On or about November 15, 2011, Bergstein emailed Hallac and Wellner what he called a "side letter" to the TT Note containing the following terms:

(a)     that Swartz IP would maintain a brokerage account at a named SEC-registered broker-dealer;

(b)     that Swartz IP agreed not to transfer funds out of that brokerage account other than in accordance with the terms of the NPA, the TT Note, and the side letter;

(c)     that upon receipt of the first $12.5 million payment from the TT Fund, Swartz IP would transfer more than $3 million to the P2 Fund and $4.4 million to Pineboard "or as directed by Pineboard"; and

(d)     that Swartz IP agreed to either:  (i) invest the $12.5 million in securities and borrow $7.5 million against those securities and then make the payments described above, or (ii) make the payments described above and then invest the remaining $5 million in liquid securities.

85.     The terms of the side letter called for using TT Fund assets in contravention of the TT Fund's investment mandate, as set out in the TT Fund offering documents, because they did not call for using TT Fund assets to invest solely—either directly or notionally—in the Hedge Fund.

86.     None of Bergstein, Hallac, or Wellner, or any other Weston employee, disclosed the existence of this side letter, or the terms of the side letter, to any TT Fund investors.

### 3.     Bergstein Misappropriates Monies Lent to Swartz IP Under the TT Note for His and Weston's Benefit

87.     On or about November 17, 2011, Weston wired $12.5 million from a TT Fund account to Swartz IP's brokerage account.  The $12.5 million in cash that was transferred out of the TT fund account was generated from Weston's two prior sales of the TT Fund's interests in the Hedge Fund:  a sale of approximately $9,999,999 on or about August 31, 2011, and a sale of approximately $2,500,000 on or about September 30, 2011.

88.     On or about November 29, 2011, Bergstein wired $1,700,675 from Swartz IP's brokerage account to a P2 Fund bank account, and on or about December 9, 2011 Bergstein wired $1,325,000 from Swartz IP's brokerage account to the same P2 Fund bank account. Bergstein wired these monies to the P2 Fund bank account to pay down the principal owed by Arius Libra to the P2 Fund under the terms of the P2 Note.

89.     On or about December 8, 2011, Hallac caused Weston to wire $5,200,000 from a TT Fund account to Swartz IP's bank account.  The $5,200,000 in the TT fund account came from Weston's sale on or about December 1, 2011 of approximately $5,741,581 worth of securities in the Hedge Fund.

90.     Shortly after receiving the $17.7 million from the TT Fund, Bergstein wired $750,000 to a bank account in the name of Purple Box for the personal benefit of Hallac, Wellner, and Weston Executive 1.  Thereafter, $120,000 was wired to an account in Wellner's name, $120,000 was wired to an account in Weston Executive 1's name, and $240,000 was wired to an account in Hallac's name.

91.     Bergstein then wired the remainder of the $17.7 million to various third parties, many of which he controlled, for his personal benefit.  Those transfers included more than $1.8 million to an entity controlled by Associate 1, at least a portion of which was used to pay Bergstein and Associate 1's joint American Express Black Card monthly credit card bill; and more than $1.8 million to two entities Bergstein controlled.  None of the transfers involved either an investment in the Hedge Fund or a medical-billing business.

92.     For example, on or about March 6, 2012, Bergstein wired $300,000 from Swartz IP's brokerage account to a bank account in the name of an entity controlled by Associate 1. Instead of using the money to invest in Pineboard, liquid securities, or otherwise to invest in medical-billing businesses as he represented, Bergstein and Associate 1 used the money substantially to pay for his and Associate 1's personal and unrelated business expenses, including expenses incurred with a firearms auctioneer, an antique watch and jewelry retailer, a bathroom and kitchen retailer, a dental/orthodontic practice, a firearms dealer, and a bonsai tree nursery.

93.     Bergstein knew, should have known, or recklessly disregarded the fact that these payments were not made to invest in Pineboard or in liquid securities (per the terms of the side letter) to preserve principal for repayment to the TT Fund, or to honor redemption requests, under the terms of the NPA, TT Note, and side letter.

94.     On or about April 20, 2012, Bergstein caused Swartz IP to wire $1 million to the TT Fund's fund administrator for the purpose of honoring a TT Fund investor's redemption request.

95.     Other than the $1 million redemption request paid by Swartz IP in or about March 2012, neither Bergstein nor Swartz IP has repaid to the TT Fund any of the $17.7 million lent to it by the TT Fund.

## FIRST CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) Thereunder

96.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1-95.

97.     Bergstein directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce or of the mails or of a facility of a national securities exchange to employ devices, schemes, or artifices to defraud; and to engage in acts, practices or courses of business, which operated or would operate as a fraud or deceit upon others.

98.     By virtue of the foregoing, Bergstein violated, and unless restrained and enjoined, will continue violating, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §§ 240.10b-5(a) and (c)].

## SECOND CLAIM FOR RELIEF
### Aiding and Abetting Violations of Sections 206(1) and 206(2) of the Advisers Act

99.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1-95.

100.    Bergstein, directly or indirectly, knowingly or recklessly provided substantial assistance to Weston, which while acting as investment advisers, by use of the mails, and the means and instrumentalities of interstate commerce, directly or indirectly, singly or in concert with others:  (a) employed devices, schemes, or artifices to defraud their respective clients or prospective clients with scienter; and (b) knowingly, recklessly or negligently engaged in transactions, practices, and courses of business which operated as a fraud or deceit upon their respective clients or prospective clients.

101.    By virtue of the foregoing, Bergstein aided and abetted, and unless restrained and enjoined, will continue aiding and abetting, violations of Sections 206(1) and 206(2) of the

Advisers Act [15 U.S.C. §§ 80b-6(1)-(2)] in violation of Section 209(f) of the Advisers Act [15 U.S.C. § 80b-9(f)].

### THIRD CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder

102.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1-95.

103.    Bergstein, directly or indirectly, knowingly or recklessly provided substantial assistance to Weston which, while acting as an investment adviser to a pooled investment vehicle, (a) made untrue statements of material fact or omitted to state a material fact necessary to make the statements made, in the light of circumstances under which they were made, not misleading, to an investor in the pooled investment vehicle; and (b) engaged in acts, practices, or courses of business that were fraudulent, deceptive, or manipulative with respect to an investor or prospective investor in the pooled investment vehicle.

104.    By virtue of the foregoing, Bergstein aided and abetted, and unless restrained and enjoined, will continue aiding and abetting, violations of Section 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8] in violation of Section 209(f) of the Advisers Act [15 U.S.C. § 80b-9(f)].

### PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently restraining and enjoining Bergstein, his agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R §§ 240.10b-5(a) and (c)] and Sections 206(1), (2), and (4) of the Advisers

Act [15 U.S.C. §§ 80b-6(1), (2), and (4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8];

## II.

Ordering Bergstein to disgorge all ill-gotten gains, plus prejudgment interest thereon;

## III.

Ordering Bergstein to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

## IV.

Ordering Bergstein to pay civil money penalties pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and

## V.

Granting such other and further relief as this Court deems just, equitable, and appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Dated: New York, New York
November 9, 2016

By: _____
Andrew M. Calamari
Lara S. Mehraban
Sheldon L. Pollock
John O. Enright
Joseph P. Ceglio
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE
   COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-5398 (Ceglio)
Email: CeglioJ@sec.gov